**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **KARL RHEN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **No. 4:23-CV-00599 PLC** |
| | ) |
| **FRANK BISIGNANO[1],** | ) |
| **Commissioner of the Social Security** | ) |
| **Administration,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

Plaintiff Karl Rhen seeks review of the decision of Defendant Social Security Commissioner Frank Bisignano denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Title II and Title XVI of the Social Security Act. For the reasons set forth below, the Court reverses and remands the Commissioner's decision.

### I.      Background and Procedural History

On September 27, 2018, Plaintiff, who was born on August 7, 1979, filed applications for DIB and SSI, alleging he was disabled as of August 11, 2018 as a result of diabetes with peripheral neuropathy, bipolar disorder, pernicious anemia, and hypertension. (Tr. 102-103, 116, 202-203, 205-211) The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 102-115, 116-129)

The SSA granted Plaintiff's request for review and conducted a hearing on September 17, 2019. (Tr. 140-144, 53-77) On November 27, 2019, the ALJ issued a decision finding Plaintiff

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano is substituted for Martin O'Malley as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of 205(g) of the Social Security Act, 42 U.S.C. §405(g).

not disabled. (Tr. 7-26) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-6)

Plaintiff appealed his case to the federal court. (Tr. 756-766) The Commissioner filed a Motion to Reverse and Remand for further administrative action, to which Plaintiff did not object. (Tr. 807) The Court granted the Commissioner's motion and remanded the action for reconsideration. (Tr. 808)

On remand, the Appeals Counsel vacated the Commissioner's final decision and remanded the case to an ALJ for resolution of several issues. (Tr. 812) Specifically, the Appeals Counsel directed the ALJ to reevaluate the evidence concerning the degree of limitations posed by Plaintiff's mental impairments, including the "potential limitations caused by [Plaintiff's] hallucinations" and "the impact of the hallucinations on [Plaintiff's] ability to perform even simple work particularly with the need to drown out hallucinations" with respect to Plaintiff's RFC. (Tr. 813-814)

Meanwhile, on September 15, 2020, while his case was pending in the district court, Plaintiff filed additional applications for DIB and SSI benefits, alleging an onset date of November 28, 2019 as a result of bipolar, "difficulty concentrating" and "flight ideas[.]" (Tr. 778-779) The SSA denied this claim and it was consolidated with the remanded claims for consideration by the ALJ. (Tr. 814-815)

The matters were assigned to a different ALJ who conducted a hearing on November 16, 2022. (Tr. 705-729) On January 17, 2023, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 679-704) The Appeals Counsel did not assume jurisdiction in the matter. Thus, Plaintiff has exhausted all administrative remedies, and the ALJ's January 2023 decision stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.984, 416.1484 (in cases remanded by a

federal court, the decision of the ALJ becomes the final decision of the Commissioner unless the Appeals Council assumes jurisdiction).

## II.     Evidence Before the ALJ[2]

### A.  Plaintiff's Testimony

Plaintiff testified at hearings conducted on September 17, 2019 and November 16, 2022. (Tr. 53-77, 705-729). Plaintiff's spouse, Tondalier Rhen, also testified at the September 2019 hearing. (Tr. 53-77)

#### 1.  September 17, 2019 Hearing

Plaintiff is married with four children. (Tr. 56) Plaintiff testified he has a four-year old, a child in middle school, and two teenagers. (Tr. 56-57) Plaintiff's "medicines make [his] memory a little bit off" and he could not remember his children's "ages[.]" (Tr. 56-57) Plaintiff's wife runs a daycare at home but he was unsure how many children attended. (Tr. 57) Plaintiff does not assist her with the daycare. (Tr. 57) Plaintiff was last employed as a bus driver for Bi-State but he quit after a passenger told Plaintiff he had "a 380 in his bag." (Tr. 58-59) Plaintiff did not remember working as a dispatcher before working as a bus driver. (Tr. 73)

Plaintiff searched for other jobs but he has difficulty keeping his "mind and…thoughts focused." (Tr. 59) Plaintiff is unable to work "[b]ecause right now I'm just a little bit all over the place some days[,]" he experiences uncontrollable "crying spells[,]" and he can feel people's "thoughts and spirits and energy." (Tr. 59-60) Plaintiff reads sometimes but does not use the computer or watch television. (Tr. 61) Plaintiff stated he was unable to work due to his fluctuating blood sugars caused by diabetes. (Tr. 61-62)

---

[2] Because Plaintiff does not challenge the ALJ's determinations regarding his alleged physical impairments and their resulting effect on his residual functional capacity, the Court limits its discussion of the evidence to Plaintiff's alleged mental impairments.

Mrs. Rhen testified she operates a daycare out of their home where she cares for ten children, including one of her own. (Tr. 63) In 2016, Mrs. Rhen noticed Plaintiff was having problems which "just kept getting worse and worse." (Tr. 68) Mrs. Rhen stated Plaintiff's job with Bi-State ended because Plaintiff was unable to concentrate and "focus on the job at hand[;]" he could not go to work due to paranoia about the passengers; and his diabetes, blood pressure, and anxiety prevented him from passing the commercial driver's license test. (Tr. 65)

Mrs. Rhen testified Plaintiff does not always take his medication because he does not remember to take it or incorrectly believes that he has taken it. (Tr. 66-67) Believing the medication would help Plaintiff improve, Mrs. Rhen argues with Plaintiff and insists that he take the medication but the medicine is "not helping." (Tr. 68) Plaintiff has tried "so many different medicines" but "none of this is working[.]" (Tr. 67) Plaintiff is unable to sleep and gets angry at Mrs. Rhen for sleeping. (Tr. 67) The medicine does not help Plaintiff sleep, "so then now he's hallucinating." (Tr. 68)

The family has to gauge Plaintiff's moods and condition daily, including his reactions to the medication. (Tr. 70) Some of Plaintiff's medications "make him feel like he [is] not in real life," while others make him angry if he does not eat. (Tr. 70) Plaintiff's providers have adjusted Plaintiff's medications in response to the negative side effects but the providers are unable to "determine whether or not it's the medicine or if it's the actual symptoms that he [has]." (Tr. 70)

Mrs. Rhen reported that Plaintiff sits and does "nothing" all day, and "sometimes he hides in the restroom." (Tr. 65) Plaintiff does not go outside and he "melt[s] down" in crowds by getting "really, really angry[,]" insisting on leaving, or crying. (Tr. 66) Mrs. Rhen does not ask Plaintiff to help with chores because he does not do them. (Tr. 67) For example, if she asks Plaintiff to sweep the kitchen floor, he will "sit…there with the broom" and insist that he is sweeping. (Tr. 67-68)

Mrs. Rhen does not "trust" Plaintiff to drive by himself "knowing that anything could happen any given moment." (Tr. 71) Plaintiff does not go anywhere except to the doctor and to church. (Tr. 71) Plaintiff inability to participate in his children's activities and assist with the household "makes him depressed" and leads him to believe that "every little thing that somebody [does] is because they disrespect him." (Tr. 71-72)

Mrs. Rhen stated Plaintiff did not want to be hospitalized, despite his psychiatrist's recommendation to do so in October 2017 and November 2018. (Tr. 69) Plaintiff is concerned he will be involuntarily hospitalized, and that hospitalization will allow Mrs. Rhen to "leave him[,]" giving Plaintiff "no reason to live." (Tr. 69)

### B. November 16, 2022 Hearing

Upon questioning by the ALJ, Plaintiff testified he has not "been good" this year, and that he needs to stay home because he sees "things" and does not "want to freak anybody out." (Tr. 714) Plaintiff attempted suicide the previous week when he "took a lot of pills to go to sleep for a long time[.]" (Tr. 714) Plaintiff, however, did not go to the hospital but "just slept for long time." (Tr. 714) Plaintiff testified he has lost control of his bladder due to his anxiety either "a couple times" or as often as "[t]hree times a week, sometimes." (Tr. 714, 719)

Plaintiff takes all his medications as prescribed by his psychiatrist but has not started the recommended ketamine treatment, stating he did not "know what that is." (Tr. 714-715) Plaintiff does not assist his wife with her in-home daycare. (Tr. 717) Plaintiff stays in his room all day trying "not to think about killing myself." (Tr. 717)

Plaintiff wants help because he was "tired of trying to kill [himself], and…tired of seeing these things." (Tr. 717) Plaintiff experiences visual hallucinations three or four times a day, which last about an hour each, and audio hallucinations twice a week. (Tr.

717-718) Plaintiff "drown[s] out the hallucinations" by taking his medication, praying, and getting "real quiet." (Tr. 718) The voices instruct Plaintiff to hurt himself. (Tr. 718)

Plaintiff does not leave the house alone because "[t]oo many different voices, and people trying to get me." (Tr. 721) Plaintiff cannot concentrate or do a simple task because he "forget[s]" and "usually end[s] up back in [his] room." (Tr. 721) Plaintiff spends approximately sixteen hours a day alone in his room. (Tr. 722) Plaintiff's wife helps him remember to take his medication. (Tr. 722) Plaintiff no longer cooks because he caused a fire after he forgot something on the stove. (Tr. 722)

During the hearing, Plaintiff requested that his wife be permitted to sit in during the hearing to ease his anxiety, which the ALJ permitted. (Tr. 715-716) Plaintiff was also "rocking…back and forth" in his chair, which he does without realizing. (Tr. 720)

C. Function Reports

1. November 6, 2018 Function Report

Mrs. Rhen completed a function report on Plaintiff's behalf in November 2018. (Tr. 249-268) Mrs. Rhen reported that Plaintiff suffered from depression, diminished interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, pressured speech, flight of ideas, and distractibility. (Tr. 249) Mrs. Rhen provides Plaintiff with his medication and gives him reminders with respect to his personal care because Plaintiff is "not interested" in attending to his personal care. (Tr. 250) Plaintiff prepared no meals and did no house or yard work because his inability to focus requires "adult supervisor[.]" (Tr. 251-252)

Plaintiff goes outside only when "forced," does not do any shopping, and does not leave the house alone because it is "too stressful." (Tr. 252) Plaintiff can no longer drive or handle any

finances because the tasks are too stressful and he has "difficulty concentrating." (Tr. 252) Plaintiff has no hobbies or interests. (Tr. 252-53) Plaintiff does not get along with others and does not spend time with others. (Tr. 252-253) Plaintiff's conditions affect his memory, concentration, understanding and ability to talk, complete tasks, follow instructions and to get along with others. (Tr. 254) Mrs. Rhen reported Plaintiff experienced feelings of self-harm, and thoughts of death and suicide. (Tr. 255)

2. <u>August 21, 2020 Function Report</u>

Mrs. Rhen completed another function report on Plaintiff's behalf in August 2020. (Tr. 939-951) Mrs. Rhen reported Plaintiff was "unable to remember locations and work-like procedures[,]" unable to maintain "sustained concentration and persistence[,]" could not adapt to any change, and was "not able to act appropriate with the general public." (Tr. 940)

On "good days[,]" Plaintiff would eat without being forced, brush his teeth, use the restroom, and talk to Mrs. Rhen. (Tr. 941) On "bad days[,]" Plaintiff was unable to get out of bed. (Tr. 941) Plaintiff has difficulty sleeping for "days" at a time then responds with medicine that causes him to sleep for twelve hours or more at a time. (Tr. 941) Mrs. Rhen gives Plaintiff his medication and daily reminders to take care of his personal care. (Tr. 942)

Plaintiff does not cook or perform any house or yard work because he is unable to concentrate and "remember what [he is] doing." (Tr. 942-943) Prior to the Covid-19 pandemic, Plaintiff went attended church services once per week. (Tr. 943) Plaintiff has no hobbies, does not spend time with others, and leaves the house only for doctors' appointments. (Tr. 944) Plaintiff does not leave the house alone, does not shop, and cannot manage his finances. (Tr. 943) Plaintiff reported hearing "a lot of things at once[,]" and an inability to remember, concentrate, complete tasks, comprehend simple questions, follow written or verbal instructions, or handle changes to routine. (Tr. 945-946) Plaintiff "[f]orgets where is he" and "no longer wants to live." (Tr. 946)

### 3. December 1, 2020 Function Report

Mrs. Rhen completed a third function report in December 2020. (Tr. 964-969) Mrs. Rhen reported Plaintiff could not comprehend, stay on task, or take directions. (Tr. 964) Plaintiff does "nothing" all day but "worry about someone getting him" (Tr. 964) Mrs. Rhen gives Plaintiff his medication and reminds Plaintiff to eat, use the restroom, and attend to his personal care. (Tr. 965-966) Plaintiff cooks no meal and does no chores. (Tr. 965-966) Plaintiff does not get along with others and cannot go outside alone because he is "paranoid." (Tr. 966-968)

### D. Medical Opinion Evidence

#### 1. State Agency Consultants[3]

##### a. Dr. Charles Watson

On November 13, 2018, Charles Watson, Psy.D., a State-agency non-examining consultant, reviewed the record and opined Plaintiff had the severe impairments of anxiety and depression.[4] (Tr. 106-108) Dr. Watson concluded Plaintiff had mild limitations in his ability to interact with others; and moderate limitations in his ability to concentrate, persistence, and maintain pace; to understand, remember or apply information; and to adapt or manage himself. (Tr. 106-109, 111-112)

##### b. Dr. James Morgan

On March 16, 2021, James Morgan, Ph.D, a State-agency non-examining consultant, reviewed the record and opined Plaintiff had the severe impairment of depression.[5] (Tr. 786-794)

---

[3] The record also contains three opinions issued by state agency consultants regarding Plaintiff's physical impairments. (Tr. 111, 792, 806)

[4] The SSA included Dr. Watson's opinion in its November 16, 2018 "Disability Determination Explanation" denying Plaintiff's initial claim for benefits related to his September 2018 application. (Tr. 102-115)

[5] The SSA included Dr. Morgan's opinion in its March 29, 2021 "Disability Determination Explanation" denying Plaintiff's initial claim for benefits related to his September 2020 application. (Tr. 778-797)

Dr. Morgan concluded Plaintiff had no limitations in his ability to understand, remember or apply information; moderate limitations in his ability to interact with others; and mild limitations in his ability to concentrate, persistence, and maintain pace, and to adapt or manage himself. (Tr. 787)

### c. Dr. Steven Akeson

On June 15, 2021, Dr. Steven Akeson, Psy.D., a State-agency non-examining consultant, reviewed the record and opined that Plaintiff's depression was non-severe.[6] (Tr. 802) Dr. Akeson opined Plaintiff had no limitations in his ability to understand, remember or apply information; and mild limitations in his ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (Tr. 802-804)

### 2. Treating Psychiatrist

### a. Malik Azfar, M.D.

Dr. Malik Azfar, Plaintiff treating psychiatrist, provided four medical source statements on fill-in-the-blank and checkbox forms. (Tr. 454, 602, 1253, 1427) Dr. Azfar's first opinion, dated July 1, 2018, explained he had been treating Plaintiff for bipolar and depression for two years. (Tr. 454) In the course of treatment, Dr. Azfar adjusted Plaintiff's medications but Plaintiff continued to experience symptoms of short-term memory issues, decreased concentration and focus, and increased stress and feelings of being overwhelmed. (Tr. 454) Dr. Azfar further identified the following symptoms: depressed mood, diminished interest in activities, appetite disturbances with weight change, sleep disturbances, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty thinking, thoughts of death or suicide, pressured speech, flight of ideas, and distractibility. (Tr. 454) As a result, Dr. Azfar opined Plaintiff had extreme limitations in his

---

[6] The SSA included Dr. Akeson's opinion in its July 12, 2021 "Disability Determination Explanation" denying's Plaintiff September 2020 application for benefits at the reconsideration level. (Tr. 800-806)

ability to understand, remember or apply information and to concentrate, persistence, or maintain pace; and marked limitations in his ability to interact with others and adapt or manage himself. (Tr. 456)

In his July 2019 opinion, Dr. Azfar reported seeing Plaintiff every two months for medication management and supportive psychotherapy. (Tr. 603) Dr. Azfar noted symptoms of depressed mood, diminished interest in almost all activities, feelings of guilt or worthlessness, difficulty concentrating or thinking, passive thoughts of death or suicide, pressured speech, and distractibility. (Tr. 603) Dr. Azfar found Plaintiff lacked the mental ability and aptitude in almost all areas necessary to perform skilled or unskilled work. (Tr. 604-605) Dr. Azfar opined Plaintiff has marked limitations in the areas of understanding, remembering or applying information; interacting with others; and concentrating, persisting, or maintaining pace; and moderate limitations in the area of adapting and managing himself. (Tr. 605)

In his third opinion, dated January 28, 2022, Dr. Azfar diagnosed Plaintiff with major depressive disorder, bipolar disorder, and "anxious distress" all with psychotic features. (Tr. 1256) Dr. Azfar rated Plaintiff's anxiety as "7/10" and his depression as 8/10," and stated Plaintiff displays angry outbursts, racing thoughts, and "agitations." (Tr. 1256) Dr. Azfar opined Plaintiff's overall pace of production would be 31 percent or more below average due to concentration issues and that he would miss three or more days per month due to visual and auditory hallucinations, and feelings of hopelessness and helplessness. (Tr. 1255) Dr. Azfar stated Plaintiff experienced marked limitations in all four broad areas of mental functioning. (Tr. 1253-1254)

In his November 2022 opinion, Dr. Azfar diagnosed Plaintiff with major depressive disorder with psychosis, bipolar with psychosis, generalized anxiety disorder, and social anxiety disorder. (Tr. 1430) Plaintiff displayed symptoms of severe anxiety, depression, isolation, poor sleep, poor appetite, some visual and audio hallucinations, racing thoughts, agitation, and feelings

of hopelessness and helplessness. (Tr. 1430) Dr. Azfar opined Plaintiff had marked limitations in his ability to concentrate, persist, or maintain pace; and no limitations in the remaining broad areas of functioning. (Tr. 1427-28) However, Dr. Azfar found Plaintiff's overall pace of production would be 31 percent or more below average and that he could not perform in proximity to co-workers, supervisors, or the general public. (Tr. 1427-1428) Dr. Azfar concluded Plaintiff would miss three or more days of work per month due to his anxiety, depression, and panic attacks. (Tr. 1429)

E.  Vocational Experts' Testimony

Vocational expert Daniel McKinney testified at the September 2019 hearing. (Tr. 72) Mr. McKinney testified that Plaintiff's past work as a bus driver constituted medium, semi-skilled work while his job as a motor vehicle dispatcher was sedentary, skilled work. (Tr. 73) The ALJ asked Mr. McKinney to consider a hypothetical individual with Plaintiff's age, education, and work experience, who is able to perform at the light exertional level with the following limitations:

> can complete simple, routine tasks with minimal changes in job duties and job setting. And the hypothetical individual can occasionally interact with coworkers and supervisor and the general public.

(Tr. 74)

Mr. McKinney concluded that Plaintiff's past work would be precluded but that such an individual could perform jobs such as bench assembler, agricultural produce sorter, and warehouse checker, which are all unskilled, light work. (Tr. 75) Mr. McKinney testified that a person off-task ten percent or more than the average worker performing the same job was unlikely to maintain competitive employment. (Tr. 75)

Vocational expert John Dolan testified at the November 2022 hearing. (Tr. 723-727) Mr. Dolan testified that Plaintiff's past work as a bus driver was medium work. (Tr. 724) The ALJ asked Mr. Dolan to consider a hypothetical individual with Plaintiff's age,

education, and work experience, and who is able to perform light work with the following limitations:

> simple, routine tasks, with minimal changes in job duties or setting, and should avoid fast-paced production work—for example, avoid work that requires hours quotas. And the hypothetical individual can interact occasionally with co-workers and supervisors, and should avoid interaction with the general public.

(Tr. 725)

Mr. Dolan concluded that such an individual could not perform Plaintiff's past work but could perform other work such as housekeeping cleaner, mailroom clerk, and copy machine operator, all light jobs. (Tr. 725) When the ALJ added to the hypothetical that the person would be off task greater than 31 percent of the workday, Mr. Dolan stated the person would not be able to work in the national economy. (Tr. 726) Mr. Dolan testified that three or more absences per week precluded employment. (Tr. 726)

Mr. Dolan testified that employers would not tolerate an employee being off-task more than ten percent of the day. (Tr. 726) Upon questioning from counsel, Mr. Dolan testified that a person could not maintain employment if they were unable to remain on task while experiencing hallucinations. (Tr. 727) Mr. Dolan further testified that employers would not tolerate "for very long" three absences a month. (Tr. 727) Mr. Dolan opined that employers do not tolerate an employee taking additional breaks beyond those "ordinarily provided by the employer[.]" (Tr. 727)

F. Medical Records

The record also includes medical records dating from April 25, 2016 through September 21, 2022 which were presented to the ALJ. [7] (Tr. 308-678, 1014-1421)

III. Standards for Determining Disability Under the Social Security Act

---

[7] Relevant medical records are discussed in detail below.

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1); 42 U.S.C. §1381a. The Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A); *See also* 20 C.F.R. § 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the ALJ engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity. *Id.* Second, the claimant must establish that he or she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(a), (c); 416.920(a), (c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [the claimant's] ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari,* 250 F.3d 603, 605 (8th Cir. 2001)). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a), (d); 416.920(a), (d). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520 (d), (e); 416.920 (d), (e).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(a), (e); 416.920(a), (e); 416.945(a)(1). RFC is "based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations." *Id.* (quoting *Lacroix v. Barnhart,* 465 F.3d 881, 887 (8th Cir. 2006)).

At step four, the ALJ determines whether the claimant can return to his or her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a), (f); 416.920(a), (f); *see* McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, the claimant will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. *McCoy*, 648 F.3d at 611. *See also* 20 C.F.R. §§ 404.1520(f); 416.920(f).

Through step four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R §§ 404.1520(a), (g); 404.1560 (c); 416.920(a), (g); 416.960(c); *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then he or she will be found to be disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV.    ALJ's Decision

Applying the five-step evaluation process, the ALJ found Plaintiff: (1) had not engaged in substantial gainful activity between August 11, 2018, the alleged onset date, and December 31, 2021, the date last insured; and (2) had the severe impairments of diabetes mellitus, obesity, major

depressive disorder/variously diagnosed as bipolar disorder, and generalized anxiety disorder. (Tr. 682-684) The ALJ concluded Plaintiff had the non-severe impairments of hypertension, dyslipidemia, and anemia. (Tr. 685)

At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 685) The ALJ also found Plaintiff's mental impairments considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06 because Plaintiff demonstrated only moderate limitations in the four broad functional areas under paragraph B of the listings.[8] (Tr. 686)

The ALJ determined Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations:

> complete simple, routine tasks with minimal changes in job duties or settings. He should avoid fast-paced production work: for example, work that requires hourly quotas. He can interact occasionally with coworkers and supervisors, but must avoid interaction with the general public.

(Tr. 688)

The ALJ also considered Plaintiff's reported symptoms and found Plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 688-

---

[8] When a claimant has a mental impairment, the Social Security Act requires the ALJ to employ the psychiatric review technique when evaluating the severity of the claimant's mental impairments. *Cuthrell v. Astrue*, 702 F.3d 1114, 1117 (8th Cir. 2013) (citing 20 C.F.R. § 404.1520a(a), 416.920a(a)). The psychiatric review technique requires the Commissioner to "first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." *Id.* at 1118 (citing 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1)). The Commissioner then rates "the degree of functional limitation" in the following four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

690) Specifically, the ALJ reviewed Plaintiff's and Mrs. Rhen's testimony regarding Plaintiff's symptoms and limitations as presented at the first hearing and concluded that while medical evidence demonstrated Plaintiff "suffers from persistent depression and anxiety (sometimes noted in the medical records as bipolar disorder)" the medical evidence "does not support the degree of limitation alleged." (Tr. 689-690)

In support, the ALJ examined the medical evidence, specifically his psychiatric treatment records, from November 27, 2018 through May 23, 2019, and from December 12, 2021 through September 21, 2022. (Tr. 690-692, citing Exs. D8F, D10F & D26F) The ALJ found the latter records demonstrated that "[s]ince December of 2021…[Plaintiff] continued to have symptoms of both anxiety and depression, but it appears his symptoms have improved over time[,]" noting Plaintiff was taking his medications, "responding well to treatment," denied homicidal ideations, frequently denied suicidal ideations, was "generally not having visual or audio hallucinations[,]" experienced improved sleep, and maintained intact executive functioning. (Tr. 691-692) The ALJ also observed that, during this period, Plaintiff isolated himself by staying "in his room most of the time due to social anxiety," reported increased disputes with family members, expressed some passive suicidal ideations, mental status examinations demonstrated impaired concentration and impaired memory, and that his treating psychiatrist adjusted Plaintiff's medication on one occasion and recommended additional treatment on two occassions because the doctor "felt that [Plaintiff] was not doing as well as possible[.]" (Tr. 691-692)

The ALJ concluded the limitations set forth in the RFC sufficiently accounted for Plaintiff's reported conditions and symptoms, noting that the medical records did not suggest "that the medical provider found [Plaintiff] is mentally incompetent to understand or manage his own treatment[,]" there was no indication that Plaintiff "presents a danger to himself or others[,]" and there was no record of hospitalizations or outpatient therapy. (Tr. 692-693)

The ALJ evaluated four of the six medical opinions from the prior administrating findings related to Plaintiff's physical and mental conditions. With respect to the opinions regarding Plaintiff's mental conditions, the ALJ found the opinions of Dr. Morgan and Dr. Akeson, the State agency consultants on initial review and on reconsideration upon the denial of Plaintiff's September 2020 application, to be unpersuasive because they were not supported by the evidence they cited or consistent with the record as whole, including evidence submitted after the consultants completed their reviews. (Tr. 693-694, 778-797, 800-806) The ALJ did not consider the opinion of Dr. Watson, the state-agency consultant who reviewed the evidence related to Plaintiff's September 2018 application for benefits.

The ALJ found the opinions of Dr. Azfar, Plaintiff's treating psychiatrist, to be unsupported and inconsistent with the credible evidence of record and, therefore, unpersuasive. (Tr. 694-695).[9] Specifically, the ALJ concluded Dr. Azfar's opinions respecting Plaintiff's limitations to be unsupported because the opinions themselves did not offer an explanation for his assessments of marked or extreme limitations and the assessments did not appear to be supported by the treatment notes. (Tr. 694) The ALJ found Dr. Azfar's opinions were inconsistent with "comments about the claimant's mental health, or lack thereof, in treatment notes of other providers" from March 2022 through September 2022. (Tr. 694)

At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (Tr. 695) Based on the RFC, Plaintiff's age, education, and prior work experience, and the vocational expert's testimony, the ALJ found Plaintiff was able to perform jobs that existed in significant

---

[9] The ALJ noted that one of the opinions, dated July 1, 2018, was offered prior to the alleged onset date and during a period of alleged disability that had previously been adjudicated. (Tr. 694) The ALJ noted that the ALJ in the prior administrative proceeding considered Dr. Azfar's July 2018 opinion and concluded it was inconsistent with the medical evidence of record. (Tr. 694)

numbers in the national economy, such as housekeeper/cleaner, mail room clerk, or copy machine operator. (Tr. 696) The ALJ therefore concluded Plaintiff was not disabled. (Tr. 696)

## V.  Discussion

Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence in that the ALJ failed to: (1) properly evaluate the medical opinion evidence, (2) properly evaluate how Plaintiff's hallucinations would affect his functioning, and (3) include an explanation of how the evidence supports the RFC. [ECF No. 20]  The Commissioner responds that the ALJ properly evaluated the medical opinion evidence and the impact of Plaintiff's hallucinations. [EFC No. 21] The Commissioner contends the RFC accommodates Plaintiff's hallucinations and is supported by substantial evidence in the record. [ECF No. 21]

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's determination, [but it] may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome." *Id*. (quoting *Prosch*, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the

evidence and one of those positions represents the ALJ's findings[.]" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)).

B. Mental RFC

RFC is the most a claimant can perform in a work setting despite that claimant's physical or mental limitations. *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. §416.945(a)(1). The ALJ determines a claimant's RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [his or her] limitations." *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (quoting *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015)); 20 C.F.R. § 416.945(a)(1).

The RFC ""is a function-by function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities[.]'" *Roberson v. Astrue*, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996)). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (quoting *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). It is the Plaintiff's burden to prove his RFC. *Kraus*, 988 F.3d at 1024

Plaintiff claims the ALJ's RFC is not supported by substantial evidence because the ALJ's decision summarizes "some of the medical evidence of record but fails to explain how the evidence demonstrates an ability to perform work at the RFC." [ECF No. 20] Plaintiff further contends the

ALJ improperly relied on temporary improvements "to discount the severity of Plaintiff's mental health symptoms[,]" in part, by misleadingly highlighting negative mental status findings while ignoring how RFC is affected by positive mental status findings which included, limited or poor insight, audio and visual hallucinations, irritable mood and agitation, paranoia, impaired concentration and memory, impair judgment, racing thoughts, outbursts of anger, and feelings of hopelessness. [ECF No. 20] The Commissioner responds that the ALJ properly considered the medical records, the medical opinions, Plaintiff's testimony, and third party evidence in determining RFC.

Contrary to the Commissioner's assertions, the ALJ did not fully account for all the relevant evidence of record in determining Plaintiff's RFC. For example, in the determination, the ALJ mentions the testimony of Plaintiff and Mrs. Rhen at the first hearing but does not acknowledge or account for Plaintiff's testimony at the second hearing. (Tr. 689-690) Even more concerning though, is the ALJ's failure to fully account for thirty months of mental health treatment records during the relevant time period, between June 2019 and December 2021, with respect to determining Plaintiff's RFC. (Tr. 691-692) Instead, the ALJ summary of the medical evidence jumps from May 2019 to December 2021, culminating in the ALJ placing considerable emphasis on improvements in Plaintiff's condition in 2022, after the expiration of Plaintiff's date last insured of December 31, 2021. (Tr. 691-692)

Dr. Azfar's treatment notes from June 2019 and December 2021 demonstrate periods of fluctuating improvement and deterioration of Plaintiff's mental health condition. While some records demonstrate occasional improvement in Plaintiff's symptoms, others document Plaintiff's reports of psychotic symptoms; auditory hallucinations; increased anxiety, depression, paranoia, and isolation; poor sleep; passive suicidal thoughts; cognitive difficulties; impaired concentration, memory, judgment, and insight; poor eye contact; restlessness; irritability; constricted affect;

pressured speech; and feelings of hopelessness, helplessness, and "panic[.]" (Tr. 1060, 1058-1059, 1056-1057, 1048-1049, 1040-41, 1139-1140, 1142, 1144, 1147, 1149-1150, 1152-1153, 1154-1155, 1157-1158, 1160-1161, 1162-1163, 1165-1166, 1167-1168, 1177-1178) Plaintiff underwent five medication adjustments during this period. (*Id.*)

These records also detail an instance in June 2021, where Dr. Azfar advised Plaintiff to "immediately…go to the Center Pointe Hospital" after Plaintiff reported passive suicidal thoughts, visual and auditory hallucinations directing him to hurt himself, poor sleep and appetite, increased anxiety and depression, racing thoughts and agitations, and isolation. (Tr. 1144) Plaintiff refused to go to the hospital or to take advised medications. (Tr. 1144) In response, Dr. Azfar contacted Mrs. Rhen to advise her of Plaintiff's condition and his recommendation that Plaintiff be taken to the hospital. (Tr. 1144) Mrs. Rhen responded that she would attempt to take Plaintiff to the hospital, but that she could not force him to do so. (Tr. 1144)

While Dr. Azfar did not seek Plaintiff's involuntary commitment, this evidence severely undermines the ALJ's conclusion, in determining RFC, that "[n]othing in the medical records suggests that the medical provider found that [Plaintiff] is mentally incompetent to understand or manage his own treatment" or that Plaintiff's provider gave "no indication…that [Plaintiff] presents a danger to himself or others[.]" (Tr. 693) Nor did the ALJ address the other evidence of record suggesting Plaintiff struggled with managing his treatment, including Plaintiff's and Mrs. Rhen's repeated representations that Mrs. Rhen had to provide Plaintiff with his medications, Mrs. Rhen's testimony about her difficulties convincing Plaintiff to take his medications, and treatment notes documenting Plaintiff's repeated decisions to stop his medications. (Tr. 53-77, 249-268, 705-729, 939-951, 964-969, 1048-1049, 1056, 1162)

The ALJ's RFC assessment must discuss and describe how the evidence supports each conclusion, and must cite specific medical facts and nonmedical evidence in doing so, as well as

resolve any material inconsistencies or ambiguities in the evidence of record. SSR 96-8p, 1996 WL 374184, at 7. In making his determination, the ALJ did not discuss or examine how the medical evidence from June 2019 through December 2021 supported his RFC assessment. *See Gilmore v. Saul*, No. 1:19-CV-00104-JAR, 2020 WL 5801042, *4 (E.D. Mo Sept. 29, 2020). In particular, the ALJ did not specifically identify how the medical evidence supported his conclusion that Plaintiff had the ability to complete simple, routine tasks with minimal changes in job duties and settings, how Plaintiff would be able to interact with coworkers and supervisor on even an occasional basis, or how Plaintiff could sufficiently remain on task to maintain competitive employment. Accordingly, the Court finds the ALJ's RFC determination is not supported by substantial evidence.

C. Evaluation of Medical Opinion Evidence

Plaintiff also contends the ALJ failed to properly evaluate the medical opinion testimony and prior administrative medical findings. [ECF No. 20] Specifically, Plaintiff contends the ALJ erred by failing to evaluate and ascribe weight to two of the opinions of the state-agency non-examining consultants, and that the ALJ's determination that the opinions of Dr. Azfar were unpersuasive was not supported by an adequate evaluation of the supportability and consistency factors. [ECF No. 20] Specifically, Plaintiff notes the ALJ's conclusion that Dr. Azfar's opinions were unsupported by the treatment notes relies exclusively on the observation that Dr. Azfar found Plaintiff possessed a marked limitation in the ability to interact with others despite "treatment records consistently noting that the claimant is of low risk for suicide or danger to himself/others." [ECF No. 20 citing Tr. 694] Plaintiff contends the ALJ "fails to explain how being at a low risk of suicide or danger to others has anything to do with Plaintiff's ability to interact with others." [ECF No. 20] Plaintiff further contends that the ALJ failed to adequately support his conclusion that Dr.

Azfar's opinions were inconsistent with the other evidence of record by citation to specific evidence. [ECF No. 20]

With respect to the ALJ's failure to adequately assess the opinions of the state agency consultants, the Commissioner responds only that "the ALJ found a more restrictive RFC than those posited by the medical and psychological consultants." [ECF No. 21] The Commissioner argues that the ALJ's examination of the supportability and consistency of Dr. Azfar's opinions was sufficient and supported by the record because: (1) there were internal inconsistencies in Dr. Azfar's November 2022 opinion, (2) inconsistencies in the limitations assessed between Dr. Azfar's opinions over time, and (3) elsewhere in the opinion, the ALJ "discussed evidence showing improvement with medication and mental status examination findings[.]" [ECF No. 21]

For claims filed on or after March 27, 2017, such as Plaintiff's claim, the ALJ evaluates medical opinions and prior administrative medical findings under 20 C.F.R. §§404.1520c, 416.920c. The regulations provides that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c (a), 416.920c (a). Rather, the ALJ will consider all medical opinions according to several enumerated factors. 20 C.F.R. §§ 404.1520c (a), (c); 416.920c (a), (c). The most important factors are supportability and consistency, and the ALJ must explain in his determination how he considered these factors for each medical source's medical opinion or prior administrative medical finding. 20 C.F.R. §§ 404.1520c (a), (b)(2); 416.920c (a), (b)(2). The ALJ must articulate in his determination how persuasive he finds all of the medical opinions and prior administrative medical findings in the case record. 20 C.F.R. §§ 404.1520c (b), 416.920c (b).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior

administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical findings will be." 20 C.F.R. §§ 404.1520c (c)(1); 416.920c (c)(1). Thus, supportability is an assessment of how well a medical source supported and explained his or her opinion. *Daniels v. Kijakazi*, No. 21 Civ. 712 (GWG), 2022 WL 2919747, at *5, (S.D. N.Y. July 26, 2022). The ALJ may consider whether the physician's own treatment notes support the physician's opinion. *Starman v. Kijakazi*, No. 2:20-CV-35-SRC, 2021 WL 4459729, at *4 (E.D. Mo. Sept. 29, 2021).

The regulations provide that "consistency" means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c (c)(2); 416.920c (c)(2). "Thus, '[c]onsistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record, not just what a medical source had available to them.'" *Daniels*, 2022 WL 2919747, at *5 (quoting *Cuevas v. Comm'r of Soc. Sec.*, 2021 WL 363682, at *10 (S.D. N.Y. Jan. 29, 2021).

Here, the ALJ clearly failed to assess every medical opinion of record. There is no dispute that the ALJ did not evaluate and ascribe weight to two medical opinions in the record, those of the two state-agency non-examining consultants presented in the SSA's initial determination denying Plaintiff benefits related to his September 2018 application.

Furthermore, the ALJ did not provide a sufficient explanation regarding the supportability and consistency factors in his assessment of Dr. Azfar's medical opinions. Here, the ALJ found Dr. Azfar's opinions "did not appear to be supported by the treatment notes" yet provided no citations to specific evidence supporting such a finding. (Tr. 694) The only explanation offered by the ALJ was a statement that treatment records consistently noting that Plaintiff was a low risk for suicide or a danger to others conflicted with Dr. Azfar's assessment that Plaintiff had marked

limitations in the ability to interact with others. (Tr. 694) The ALJ provides no explanation of why a low risk in these areas are deemed sufficient to downgrade a claimant's limitations in this functional area. Nor does the ALJ provide any explanation for his finding that Dr. Azfar's assessment in the other areas of mental functioning were not supported by the doctor's treatment notes.

With respect to the consistency of the opinions with the other evidence of record, the ALJ made the blanket statement that Dr. Azfar's medical opinions were not "consistent with the credible evidence of record, including comments about the claimant's mental health, or lack thereof, in treatment notes of other providers." (Tr. 694) In support, the ALJ provided general citations to entire exhibits for medical records covering the period between March 11, 2022 and September 13, 2022. (Tr. 694) The ALJ cited no specific evidence supporting his finding with respect to consistency and cited to no evidence relating to the period of disability between August 11, 2018 and December 31, 2021 in support of his conclusion.

Pursuant to 42 U.S.C. §405(g), this Court has the power to affirm, modify or reverse "the decision of the Commission of Social Security, with or without remanding the cause for a rehearing." Upon consideration of the foregoing, the Court remands this matter to the Commissioner to more fully identify, evaluate, and supplement as necessary the medical and nonmedical evidence of records supporting either his original conclusion as to Plaintiff's RFC, or any amended RFC determination he may render. Further, the Court instructs the ALJ to consider and explain in his determination the level of persuasiveness of the medical opinions and prior administrative medical findings in the case record in accordance with 20 C.F.R. §§ 404.1520c and 416.920c. Because the ALJ will need to reassess all of the evidence on remand in determining Plaintiff's RFC, the Court need not address Plaintiff's remaining arguments.

**VI.    Conclusion**

Accordingly, for the reasons sets forth above,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and the case is **REMANDED** to the Commissioner for further consideration consistent with this Memorandum and Order.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of September, 2025